**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Anchor Wall Systems, Inc.,

Plaintiff,

v.

Concrete Products of New London, Inc.,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-465 ADM/AJB

---

Alan G. Carlson, Esq., and Dennis C. Bremer, Esq., Carlson, Caspers, Vandenburgh & Lindquist, Minneapolis, MN, and Douglas A. Strawbridge, Esq., Anchor Wall Systems, Inc., Minnetonka, Minnesota, appeared for and on behalf of the Plaintiff.

Randall T. Skaar, Esq., and Scott Ulbrich, Esq., Patterson, Thuente, Skaar & Christensen, P.A., Minneapolis, MN, appeared for the Defendant.

---

## I. INTRODUCTION

On January 14, 2003, counsel for the parties in this matter presented oral arguments before the undersigned United States District Judge on Defendant Concrete Products of New London, Inc.'s ("CP") Motion for Partial Summary Judgment [Docket No. 69]. CP seeks partial summary judgment of non-infringement of four of Plaintiff Anchor Wall Systems, Inc.'s ("Anchor") Patents: U.S. Patent No. 5,827,015 (issued October 27, 1998) ("the '015 Patent"), U.S. Patent No. 6,142,713 (issued November 7, 2000) ("the '713 Patent"), U.S. Patent No. 6,183,168 B1 (issued February 6, 2001) ("the '168 Patent"), and U.S. Patent No. 6,312,197 B1 (issued November 6, 2001) ("the '197 Patent"). These Patents describe and claim concrete blocks for use in construction of retaining walls.

MAR 26 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. BACKGROUND

Anchor is a major seller of concrete retaining wall blocks. It licenses production rights to its designs to a network of authorized manufacturers. CP markets and manufactures its own line of concrete blocks. Anchor instituted the present action on March 13, 2001, alleging that several of CP's products infringe numerous claims of the above-listed Patents. Accused in this suit are versions of blocks that can be grouped into five general types: Londonstone, Straight Face Londonstone, 4" Londonstone, Decrowall, and Rugged Londonstone designs (collectively, "accused products" or "accused blocks"). Though Anchor avers infringement of multiple claims of each Patent, the instant dispute revolves around just three claim elements. In support of its Motion, CP argues there can be no infringement because certain accused blocks either (1) lack a solid top surface, (2) lack sidewalls with distinct first and second parts, or (3) contain cores, in contrast to the limitations of the relevant claims.

## III. DISCUSSION

Summary judgment will be rendered when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine dispute of material fact is present and summary judgment is inappropriate when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and makes all permissible inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Summary judgment of non-infringement involves a two-step process in which the court

first construes the patent claims at issue, and second, compares the properly interpreted claims to the accused product to determine whether or not the scope of the claims covers the accused product. Pitney Bowes v. Hewlett Packard, 182 F.3d 1298, 1304 (Fed. Cir. 1999); see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). Claim construction is a question of law. Pitney Bowes, 182 F.3d at 1304. The infringement determination is a question of fact. Id. "Thus, summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." Id.

**A. Claim Construction**

In claim construction, terms are to be construed objectively, as a person of ordinary skill in the art would understand them. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324-25 (Fed. Cir. 2002); Markman, 52 F.3d at 986. The inquiry begins with the claims themselves, whose language is given its ordinary meaning unless the patentee provides a particular definition. Teleflex, 299 F.3d at 1325. The intrinsic record of the patent should provide the primary source of evidence of interpretation. See id. "Among the intrinsic evidence, 'the specification is always highly relevant to the claim construction analysis'" and is "'the single best guide to the meaning of a disputed term.'" Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The court should also refer to the prosecution history and the prior art referenced therein for evidence of definition of and limitation on claim scope. Vitronics, 90 F.3d at 1582-83. Dictionaries and treatises are considered particularly useful for discerning the ordinary meaning of claim language. Bell Atlantic Network Servs., Inc. v. Covad Comms.

Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001). The parties agree that the claim terms at issue are not specifically defined and thus should be given their ordinary meanings.

**1. Solid**

Many of the claims at issue recite a top surface that is solid. See, e.g., '015, claim 1(c) ("[T]he top surface and the sidewall surfaces are generally solid and continuous across their entire extents."). Both parties cite the same dictionary, which defines "solid" as "being without an internal cavity" or "not interrupted by a break or opening." Merriam-Webster's Collegiate Dictionary 1118 (10th ed. 1997). CP focuses on the latter definition, while Anchor asserts the former, urging that "solid" is generally understood to mean "no holes." The American Heritage Dictionary of the English Language provides that "solid" means "[n]ot hollowed out" or "[w]ithout gaps or breaks; continuous." American Heritage Dictionary of the English Language 1229 (1975).

CP additionally relies on the prosecution history of the '015 Patent in which Anchor emphasized the "elegant simplicity" of its "one block" system, stating that the solid top surface provided a smooth finish that negated the need for a top cap block. See Amendment and Verified Response at 18-22 (Ali Decl. Ex. D). After the examiner rejected various claims of the '015 Patent, Anchor submitted numerous amendments and additions to the application, as well as remarks encouraging reconsideration and explaining the invention. See generally id. Specifically, CP references Anchor's comment that "because the top and side surfaces of the block are solid (planar or finished), without recesses, cores, or protrusions, no cap blocks are required to finish a wall," arguing that this statement reflects the appropriate meaning of solid: without recesses, cores, or protrusions. Id. at 22.

Though Anchor focused in the prosecution history on promoting the benefits of its single block system, repeating multiple times the advantage of eliminating the need for a cap or top block, this cited statement does not explicitly define "solid." Id. at 18-22. Rather, it expresses a description of the surface of the block that may be read either conjunctively or disjunctively, and therefore does not purport to offer a precise definition. Other discussions in this same Amendment and Verified Response support Anchor's contention that it was arguing the solidity of its block surfaces distinguished its product from prior art with large, open holes in the block faces, indicating the varying uses of the term in the prosecution history. Id. at 52-53 (arguing that rejection in light of the Swiss Patent was incorrect because the Swiss Patent teaches large open core hole through sides of block and therefore lacked "sidewall surfaces that are solid and substantially continuous"). However, the "no holes" definition advocated by Anchor is overly narrow and use of "solid" is not so limited in the Patent record or in ordinary parlance.

Pursuant to customary usage and the context of the '015, '713 and '197 Patents, "solid" is properly understood as "without breaks or openings." This construction is consistent with the prosecution history cited by both parties, which draws a distinction between the solid top surface of the '015 Patent claims and prior art that included large open spaces within the top surface area and therefore necessitated the use of a cap block. Id. at 20, 40.

**2. Sidewalls Comprising First and Second Parts**

The parties also dispute whether the accused blocks posses two-part sidewalls. Claim 1 of the '168 Patent, like the other claims asserted with respect to this element, directs that the block must have "first and second sidewall surfaces, each of said sidewall comprising a first and second part." CP submits that this limitation requires two distinct sidewall elements, separated

by some clear demarcation, as seen in the figures contained in the specifications. Anchor offers no construction of two part sidewall, stating that there is no disagreement as to the meaning of this element, only as to infringement.

The logical, plain meaning of "first and second part" is that the item described must have two components: a first and a second. The figure drawings in Anchor's Patents, which identify numerically two separate block surfaces making up the sidewall first and second parts, affirm this common sense and undisputed interpretation. See, e.g., '015, Figs. 1-6.[1] Accordingly, "sidewall comprising a first and second part" is a sidewall with two distinct sidewall surfaces.

**3. Core**

The parties next dispute the interpretation of the limitation requiring the claimed blocks be free from cores. See, e.g., '713, claim 61(e) ("[T]he block is free from cores extending through the block, either from the upper to the lower surface, or from one side to the other."). CP argues a "core," as recited in the Patent claims, is "an opening extending through the block from the upper to the lower surface." Def.'s Mem. at 3C. Anchor states that "core" ordinarily means "a central and often foundational part usually distinct from the enveloping part by a difference in nature." Pl.'s Mem. at 15 (quoting Merriam-Webster's Collegiate Dictionary).

The general understanding of "core" conveyed by dictionary definitions such as that cited above, is the central or interior part of something, such as a piece of fruit or the earth. See, e.g., Webster's Third New International Dictionary 506 (unabridged ed. 1993) (defining core in the first instance as "the central and often foundational part of a body, mass or construction . . ."). The meaning of "core," however, like so many words, varies depending on the context of use.

[1] All of the Patents at issue share the same figure references.

The Patents do not include an express definition of this term, but do offer indicia of the understanding of the meaning of "core" in relation to the inventions. The '015 Patent specification, particularly, provides some insight into the usage of "core" in the context of concrete retaining wall blocks. See '015, col. 10: 2-7. In discussing the manufacturing of the blocks, "core forms" are indicated as a means of preventing the formation of portions of interior mass so as to "lighten the block." Id. at col. 10: 5. As part of the molding process, the core forms prevent mix from entering the areas of their positions, thereby creating voids in these areas in the final block. Id. Figs. 11-13, col. 8: 55-56, cols. 9-10: 65-13. The representative figures indicate multiple interior voids bounded by block mass. See id. Figs. 11-13.[2]

The prosecution history of the '713 Patent provides further contextual meaning. Referencing Figures 11-13, which depict the core forms used in the molding process, these remarks explain Anchor's understanding of the industry definition of a core. "Cores, as known in the industry, are larger openings in blocks which extend at least partially through the block from bottom to top, although they can go entirely through a block. . . . Alternatively, cores can extend through a block from side to side." Amendment and Response of 10/29/99 at 17 (Ali Decl. Ex. C). Additional support for this interpretation is found in the prosecution history of the '015 Patent, which references and discusses U.S. Patent No. 4,909,010, issued March 20, 1990 (the "Gravier" Patent). Amendment and Verified Response at 40 (Ali Decl. Ex. D). Anchor sought to distinguish this prior art, in part on the basis of the Gravier Patent's "upwardly-opening cores." Id. Figures associated with the Gravier Patent show two large voids in the body of the

---

[2] Drawings in the specification may play a significant role in construing the meaning of a claim term. See CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1153 (Fed. Cir. 1997).

block that extend through and are therefore visible through the top surface. Gravier Patent, Figs. 1, 7 (Moore Decl. Ex. 17).

These materials, along with the specification, which is the primary source of interpretive evidence, establish a particular application and meaning in the art, similar to and supported by ordinary understanding. See Vitronics, 90 F.3d at 1582, 1583. Based on the usage revealed in the intrinsic Patent records, "core" is construed as "a relatively large void of constituent mass bounded by the body of the block." As explained in the specification and prosecution history, cores lessen the weight of the block and may extend partially or fully through a block.

**B. Infringement**

Literal infringement occurs when the accused product contains every limitation of the asserted claim, exactly. Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). If there is no literal infringement, a plaintiff may establish infringement under the doctrine of equivalents by showing that the accused device has an equivalent counterpart to every claim limitation. Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1444 (Fed. Cir. 1997) (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21, 40 (1997)). An accused feature and a claim element are equivalent if nothing more than insubstantial differences distinguish the two. Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1359 (Fed. Cir. 2002) (internal citation omitted). Infringement under either inquiry is a question of fact. Southwall, 54 F.3d at 1575.

**1. Solid Top Surface**

CP claims the accused blocks cannot infringe claims 1, 2, 28, 38, 41 or 50 of the '015 Patent because they lack a solid top surface. Additionally, CP argues that there can be no

infringement by equivalents because Anchor is estopped from asserting any equivalents to this limitation.

In relevant part, claim 1 recites a block "wherein the top surface and the sidewall surfaces are generally solid and continuous across their entire extents." '015, claim 1(c). Claim 2 states in part that the claimed retaining wall block must have upper and lower faces "wherein the upper face and the side faces are substantially solid and continuous throughout their extents." Id. at claim 2(f). All of these claims contain similar limitations requiring the top or upper surface (also referred to as top or upper "face") be "solid." See id. at claims 28(b)(vii), 38(a), 41(f), 50(a).

Similarly, CP argues claims 8, 30, 36, 43, and 57 of the '713 Patent and claims 1 and 3 of the '197 Patent do not read on the accused products because each of these claims also requires a solid top surface or face. As stated above, "solid" in the present context means "without breaks or openings."

CP bases its argument of non-infringement of the above claims entirely on the assertion that the splitter slots contained in the accused blocks create a "void or recess" that renders the top surface not solid. Def.'s Mem. at 13. Anchor contends that the file history and the interrelation of certain claims of the '015 Patent establish that a surface may be solid despite the presence of a splitting notch, and thus that CP's blocks literally include this limitation.

Anchor has produced sufficient evidence of a material factual dispute to withstand summary judgment of non-infringement regarding these claims.[3] As Anchor argues, the Patent claims, figures and prosecution histories establish that a small indentation in the perimeter of the

[3] Because a dispute of material fact remains as to literal infringement, the issue of infringement under the doctrine of equivalents is not addressed at this time.

block, to facilitate splitting, does not defeat solidity of the top surface. Claim 47 of the '015 Patent, which is dependent on claim 1, reads "The block of claim 1 wherein the sidewall surfaces include one or more notches." '015, claim 47.[4] Similarly, claim 49, depending from claim 28, which requires the upper surface be "substantially solid," recites a block with vertical grooves in the sidewalls. '015, claims 28(b)(vii), 49; see also id. Fig. 2; Amendment and Response of 10/29/99 at 21 (Ali Decl. Ex. C) (remarking in the '173 Patent prosecution history that "small vertical indentations (splitting vee's or notches) can be useful" for splitting the blocks). Thus, the Patent teaches a block with both a solid top surface and notches or grooves in the sidewalls.

Whether or not CP's splitter slots of varying sizes create top surfaces that are not solid is a factual determination. Anchor has cited the internal consistency of '015 Patent claims 1 and 47 as evidence that solid does not require the absence of all indentation, as well as the expert report of Peter Janopaul ("Janopaul"), concluding that this limitation reads literally on the accused blocks. Janopaul Report at 15-16 (Janopaul Decl. Ex. A). CP cites no evidence to support its conclusory assertion that its blocks lack a solid top surface or face. Accordingly, summary judgment regarding the presence of a solid top surface is denied.

**2. Sidewalls Comprising First and Second Parts**

With respect to this disputed limitation, Anchor asserts that the Londonstone, 4" Londonstone, and Decrowall blocks infringe claims 1, 28, and 41 of the '015 Patent, claims 1,

---

[4] Contrary to CP's assertion, this argument does not render claim 1 or claim 47 invalid for indefiniteness. The claim language is reasonably clear and "capable of being understood in the context of the patent." All Dental Prodx LLC v. Advantage Dental Prods., 309 F.3d 774, 779 (Fed. Cir. 2001). Reading claims 1 and 47 together simply adds to the understanding of the meaning of "solid" within the Patent. See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1445 (Fed. Cir. 1997) (stating that claims are to be interpreted in a way consistent with their dependent claims).

36, 47 and 70 of the '713 Patent, and claim 1 of the '168 Patent. It further alleges infringement of claim 4 of the '197 Patent by CP's Rugged Londonstone blocks. In support of summary judgment of non-infringement, CP argues that certain versions of these products do not possess sidewalls with distinct first and second parts as recited in the claims.

Claim 1 of the '713 Patent is illustrative of this limitation, stating in relevant part that the claimed masonry blocks include "opposed first and second sidewall surfaces said sidewall surfaces adjoining said block upper and lower surfaces, each of said first and second <u>sidewall surfaces comprising a first and second part</u>." '713, claim 1(a) (emphasis added).

Because this limitation requires two distinct sidewall surfaces, CP argues its Londonstone V.7, 4" Londonstone V.3, and Decrowall V.4 blocks cannot literally infringe claims 1, 36, 47 and 70 of the '713 Patent and claim 1 of the '168 Patent.[5] <u>See</u> <u>supra</u> p. 6. These blocks, it contends, possess only one discernable sidewall intersecting a curved front face.

Again, fact disputes preclude summary judgment. CP relies solely on the contention that the curvature of the front face of these blocks means there is no "second discernable plane on the sidewall." Def.'s Mem. at 16. As the specification makes clear, however, a sidewall first part may simultaneously be a part of the front surface and of the side surface. <u>See</u> '015, col. 7: 31-34 (commenting that "the sidewalls first part 34, 38 effectively become the second and third faces of a three faceted front of the block"). Furthermore, the specification advises that the front surface

---

[5] CP also makes this assertion regarding its Straight Face Londonstone and "New" design products. However, Anchor does not allege infringement of these claims by the Straight Face blocks and the December 3, 2002 Order provides that the new versions of the blocks are not part of this litigation. Order of 12/03/02 [Docket No. 79]. Additionally, though not deemed significant for this infringement analysis because of the nature of CP's arguments and of the evidence presented to refute summary judgment, the Court was not provided with a photo or other depiction of the V.7, version 7, of the Londonstone block.

of claimed block "may be smooth, rough, planar or nonplanar, single faceted or multi-faceted." Id. at col. 5: 2-3.

In addition, Anchor proffers expert opinion that the accused blocks, even with rounded or truly curved front faces, literally infringe the two part sidewall limitation, based on the specification language encompassing rounded or multi-faceted front surfaces. Janopaul Report at 10-11. Summary judgment on this issue is therefore denied.

**3. Free from Cores**

Finally, CP argues that the accused Londonstone V.7, Rugged Londonstone designs, Straight Face Londonstone designs, 4" Londonstone V.3, and Decrowall V.4 are not "free from cores" and therefore cannot infringe claim 61 of the '713 Patent or claims 4, 7 and 8 of the '197 Patent. These claims require the block to be "free from cores extending through the block, either from the upper to the lower surface, or from one side to the other," or that the generally planar upper surface be "free of cores and recesses." '713, claim 61(e); '197, claims 4(a), 7(a), 8(a). "Cores" are "relatively large voids of constituent mass bounded by the body of the block." Supra p. 8.

CP argues the splitter slots in its blocks are cores. Anchor asserts that the '713 Patent establishes that a vertical indentation in a block's surface, such as CP's slots, are not the equivalent of cores.

Dependent claim 66 of the '713 Patent claims a block in which the sidewalls possess "at least one indentation." '713, claim 66. Claim 61, one of the independent claims from which 66 depends, recites a block "free from cores extending through the block," such that the block includes indentations while also being free of cores. Id. at claim 61(e). This evidence,

suggesting CP's slots are not cores, supported by expert opinion that the accused blocks are literally free from cores, requires denial of summary judgment as to non-infringement of these claims. See Janopaul Report at 18.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Concrete Products of New London, Inc.'s Motion for Partial Summary Judgment of Non-Infringement [Docket No. 69] is **DENIED**.

BY THE COURT:

s/ Ann Montgomery

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: March 26, 2003