01-cv-465 ADM

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| ANCHOR WALL SYSTEMS, INC. a Minnesota corporation, Plaintiff, | ) | Civil Action No. 03-3271 ADM/AJB |
| v. | ) | |
| CONCRETE PRODUCTS OF NEW LONDON, INC. a Minnesota corporation, Defendant. | ) | **EXPERT REPORT OF JOHN POTTER** |

Pursuant to Fed. R. Civ. P. 26(a)(2)(B), Defendant Concrete Products of New London, Inc. ("Concrete Products") offers the preliminary report of John Potter in support of Concrete Products' defenses and counterclaims in the above-captioned litigation.

## I. INTRODUCTION

This report documents my preliminary opinions regarding the claims made by Anchor Wall Systems ("Plaintiff") against Concrete Products. Specifically, Plaintiff alleges that Concrete Products is infringing three of Plaintiff's patents by selling certain segmental retaining wall (SRW) concrete blocks. The three patents are: U.S. Patent No. 6,312,197 B1 (the '197 Patent), which issued November 6, 2001; U.S. Patent No. 6,142,713 (the '713 Patent) which issued November 7, 2000; and U.S Patent No. 6,183,168 B1 (the '168 Patent), which issued February 6, 2001. I have been asked to form an opinion regarding two issues: (1) whether the retaining wall blocks themselves, and the mold processes claimed within the patents in suit were obvious to one skilled in the art as of or before February, 1989; and (2) whether the SRW blocks manufactured by Concrete Products actually infringe any of Plaintiff's patents.

It is my understanding that another patent, U.S. Patent No. 5,827,015 (the '015 Patent), which issued October 27, 1998 is the "parent" patent of the other three, and the other three patents are, in whole or in part, derivative of the '015 patent. Therefore, this preliminary opinion also discusses certain claims of the '015 patent, to the extent that those claims relate to the claims of the three patents in suit. The claims of the '015 patent relate to the three patents in suit in various ways. For example, it is my understanding that the patent examiner who reviewed the initial application for the '197 patent initially rejected seven pending claims of the '197 application as being not patentably distinct from claims of the '713 Patent and two other predecessor U.S. patents from which the '197 Application claimed priority, one of which was the '015 Patent. In addition, it is my understanding that certain of the claims contained in the initial

SCANNED
AUG 17 2004
U.S. DISTRICT COURT MPLS

'713 patent application were also initially rejected, because those claims were considered to be obvious variations of the invention disclosed and claimed in the '015 patent. This information is relevant to the three patents in suit, because it indicates that the claims of the alleged invention disclosed in the '015 patent and the claims of the '713, '197, and '168 patents are strongly related.

In forming my preliminary opinion, I have reviewed and relied on the following:

- Various pleadings, discovery materials, and other documents provided by Leffert Jay & Polglaze, counsel for Concrete Products;
- The expert reports offered by Concrete Products' previous expert, Victor Elias;
- The expert reports offered by Anchor's expert, Peter Janopaul;
- Various affidavits offered by Concrete Products and Anchor;
- Numerous patents, drawings, manuals, and other prior art documents provided to me by counsel for Concrete Products;
- The three patents-in-suit, and the '015 patent; and
- My professional experience, expertise and knowledge based on 15 years of experience in the retaining wall industry.

A list of all documents, data and sources I relied on in forming my opinions is attached as Appendix One.

I reserve the right to timely supplement both my report and Appendix One, to the extent that I am asked to review any additional information that has not yet been provided to me.

## II. MY QUALIFICATIONS

My professional experience and expertise in the area of SRW and concrete modular blocks is as follows:

I have 15 years of experience in the retaining wall industry, which includes the following areas: the manufacturing process used to make SRW blocks; the molds used to form the blocks; first-hand experience observing block machines in operation; research and development of retaining wall products; licensing and sales of various retaining wall products; and observation and review of other retaining wall products on the market, including those made by Keystone's competitors.

## III. COMPLETE STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASES THEREFOR

I have examined the '015 patent (which is not in suit, but relates to the three patents in suit), the '197 Patent, the '713 Patent, and the '168 Patent in forming my opinions. The "015 patent (the "parent" patent) has several claims. I have condensed the principal independent claims of the '015 patent to the following main elements:

1. Discloses a concrete block composed of a front, back, top and bottom surfaces substantially parallel and continuous as indicated in Claim 1 and 2.
2. Having a flange extending from the block having a specific ratio range of the depth of flange to depth of block as in Claim 1 and 2.
3. Said block being suitable for constructing a stacked mortarless retaining wall including serpentine geometries. To facilitate the latter the block sides may be tapered as in Claim 1 and 2 and other repetitive claims.
4. Having a decorative front face obtained by splitting the block as manufactured as in Claim 11 and numerous other repetitive claims
5. A block manufactured by using a mold that is placed in a block machine capable of filling the mold with concrete mix, vibrating the concrete mix within the filled mold, compacting the masonry block mix within the mold by using a compression head, stripping the uncured unit from the mold, transporting the uncured unit to a curing location, curing it, and transporting it to a splitting location as in Claim 28 and numerous other repetitive claims.

The '197 patent also has several claims. I have condensed the principal independent claims of the '197 patent to the following main elements:

1. Discloses a retaining wall block "suitable for use in forming a pinless, mortarless retaining wall," and having a pair of substantially parallel and planar upper and lower faces;
2. A front face joining the upper and lower faces that is substantially perpendicular to the upper face at the intersection of the front face and the upper face;
3. A rear face which is substantially perpendicular to the upper and lower faces;
4. A pair of side faces that join the front and rear faces;
5. A flange extending below the lower face of the block, said flange having a rear face which is substantially an extension of the rear face of the block, said flange further including a front locking surface which intersects the lower face of the block; and
6. A block "suitable for forming a serpentine wall by dry stacking multiple blocks in successive, overlying set back courses," and having a flange formed on the block body adjacent to the back face of the block body, extending downwardly from the bottom surface of the block body.

The '713 patent also has several claims. I have condensed the principal independent claims of the '713 patent to the following main elements:

1. Discloses "a composite masonry block suitable for forming a retaining wall by dry stacking multiple blocks into successive overlying courses of blocks;"
2. A block body, comprising a front surface and a back surface that are substantially parallel to each other;
3. A flange extending downwardly from the lower block surface, said flange comprising a setback surface and a locking surface; and
4. A retaining wall block "suitable for use in forming a mortarless retaining wall by dry stacking courses of said blocks," in which the upper surface of the blocks is solid and uninterrupted by holes.

The '168 patent also has several claims. I have condensed the principal independent claims of the '168 patent to the following main elements:

1. A masonry block "suitable for use in forming both straight and serpentine retaining walls with a set back from course to course, said block having a block body and an integral locator lip," and "being the product formed by a compression molding process";
2. A masonry block formed by pouring concrete mix into a mold, and then vibrating the concrete mix within the mold, and then compacting the concrete mix within the mold using a compression head;
3. A masonry block having a decorative face and sidewall parts formed by one or more "splitter blades."

In addition, all of the patents at issue disclose a block formed by using a masonry block mold. The blocks are formed by filling the block mold with mix, and then vibrating and compacting the mix within the mold.

**<u>A. The Retaining Wall Blocks Themselves, and The Manufacturing Processes Claimed Within the Patents-in-Suit Were Obvious to One Skilled in the Art as of or Before February, 1989.</u>**

With reference to the claims stated above for each patent, I offer the following opinions:

*Parallel and continuous block surfaces.* These features are obvious to any practitioner skilled in the art and have been the staple of masonry block design for as long as I have been working in the industry. Continuity is a designer choice in which the added weight has to be weighted against cost of the additional materials or other structural reasons, which may be application specific.

*Mortarless retaining walls.* Relatively small blocks used for the construction of relatively low mortarless gravity walls with a lip or flange have been in use in the United States for many years prior to 1989. Examples of such blocks include: the Loeffelstein block, which has been known and in use since at least 1982 when Loeffelstein first published a design manual describing the technology; Redacted, the Besser Boral rear-lipped product; the 1940 Schmidt '363 patent; the 1922 Bigler patent; the 1987 Swiss Schiffer patent; and the 1985 Canadian patent 1,188,116. Each of the products described in these patents features a concrete block used in retaining walls with either a front or rear lip or flange.

I personally reviewed one such wall made with Loeffelstein blocks in 1986. The wall was constructed at a Fleet Farm in Lakeville, Minnesota, using the Loeffelstein block with the front lip, or batter. I inspected this wall as it was being built.

The tapering of the sides of masonry blocks to facilitate construction of curved walls, corners and arches has to my knowledge been known for many years, and certainly for as long as I have been in the industry. Therefore the concept of mortarless retaining walls built with small

blocks, tapered on their side, that can be stacked without the use of heavy lifting equipment and constructed in serpentine alignment was certainly well known to those skilled in the art well before February, 1989.

*Incorporation of a lip flange.* Flanges being front or back "lips" or batters that serve as an alignment mechanism or guide to ensure that the wall is being erected without distortions. Pins have been used for this purpose in many types of precast modular concrete walls in connection with MSE structures. Typical examples to my knowledge that were in existence well before March 1989 are the Hilfiker RSE panels and the 1972 Vidal concrete panel patent 3,686,873.

The back lip concept is clearly illustrated by the 1940 Schmidt '363 patent, the 1922 Bigler patent, the 1987 Swiss Schiffer patent, Redacted .. the Besser Boral rear-lipped product, and the 1985 Canadian patent 1,188,116. It would be obvious to any skilled practitioner in the art that this is an excellent but not unique method to achieve uniform alignment.

The setback created by the rear lip or flange varies from block to block. The width of the setback angle is dictated primarily by aesthetic reasons rather than for any technical reason. For this reason, it does not raise itself to the level of an invention. For example, Claim 16 of the '015 patent, which indicates that the setback ranges from 1 to 2 inches, determines the range of flange dimensions.

Redacted

The automatic setback has the obvious additional benefit of decreasing the earth pressure on the wall, a fact well known since 1776 with the publication of Coulomb's earth pressure theory still in use today in the design of earth structures.

Therefore the use of a protruding lip as an alignment method is and was certainly well known to those skilled in the art well before February, 1989.

*Decorative split block face.* A decorative split face certainly appears to be disclosed in a Diamond Wall System product specification ("the Diamond Tech Spec") dated September 1988, and also in the 1987 Keystone '463 patent. To my knowledge it has been standard, well before 1989, in the dry cast block industry to cast double blocks and then split them. This was the practice employed by Keystone during the time I worked there for certain blocks made prior to 1989. The nature and dimensions of the split are simply a function of the design of the splitter blade, which can be varied to accommodate various aesthetic requirements.

*Manufacturing process.* The "product by process" claims as described in Claim 28 of the '015 patent, and Claim 1 of the '168 patent appear to mirror the standard manner in which concrete masonry blocks have been made in high-speed masonry block machines well before 1989. It is interesting that the description in column 11 lines 2-5 of the '015 patent confirms this by stating "Any block machine known to those of skill in the art may be used. One machine

which has been found useful in the formation of blocks in accordance with the present invention is a Besser V3/12 block machine."

Based on the above, it is my opinion that the prior art would have provided a motivation or suggestion to one of ordinary skill in the art that would lead the individual to combine the relevant teachings of the references in the prior art to reach the results achieved in each of the three patents in suit. In other words, the prior art that I reviewed would clearly teach all of the elements contained in the three patents in suit, and one skilled in the art could combine those elements. As just one example, the October 6, 1987 memorandum from Gene F. Ernst to Paul Forsberg in which Mr. Ernst states that "keying by way of notches in the block would be the most obvious way" of stacking and securing blocks indicates that the flange or lip disclosed by each of the three patents in suit was obvious to one of ordinary skill in the art.

Redacted

**B. The Description of "A Person of Ordinary Skill in the Art" Offered by Anchor's Expert is Inaccurate.**

I have reviewed the expert opinion of Anchor's infringement expert, Peter Janopaul. In that report, Mr. Janopaul asserts that a person of ordinary skill in the art (that is to say one qualified to offer an opinion on obviousness) must have years of hands-on experience and training in "operating high-speed block machines, manufacturing blocks with such block machines, and designing and using molds in such block machines," and must also have hands-on experience and education in the SRW industry. (Janopaul Report of September 3, 2003 at 17.) Mr. Janopaul's description of a person of ordinary skill in the art is flawed for several reasons.

First, his description is unduly narrow. Based upon my understanding of the issues in this case, a person of ordinary skill in the art is one with at least several years of knowledge, and/or experience specifying, building and designing SRW walls made with modular concrete blocks, coupled with knowledge of how those blocks are used when building the wall, including the various features of said blocks, and knowledge, training or experience regarding how said blocks are manufactured on a high-speed block machine. As discussed above, I have 15 years of experience in this area, gained from working with Keystone Retaining Wall Systems, Inc. It is my understanding that it is improper to limit the relevant prior art to the specific field of the inventor (here, apparently, manufacturing blocks and operating block machines). Rather, the

relevant prior art should encompass related or analogous arts as well. To the extent Mr. Janopaul asserts that the relevant field of prior art is limited to "operating high-speed block machines, manufacturing blocks with such block machines, and designing and using molds in such block machines," his description is unduly narrow and improper.

Moreover, it is my understanding that the "person of ordinary skill in the art" is a theoretical construct, and is not descriptive of some particular person. It is also my understanding that knowledge of the relevant prior art is the most important factor for a person of ordinary skill in the art – not technical experience in a specific discipline. As discussed above and in my preliminary report, I have thorough knowledge of the relevant prior art, which in this case is art concerning building and designing retaining walls using modular blocks.

Finally, I have personally observed block machines in use on numerous occasions. The basic technology used in building and using block machines has changed very little since World War II. The block machines themselves are relatively simple mechanical devices. Apparently, Mr. Janopaul asserts that a "person of ordinary skill in the art" must be someone who has an advanced engineering degree, or someone who has personally built and used block machines. This opinion places an undue reliance on perceived technical skills instead of knowledge of the relevant prior art. In this case, the "technical skills" required to understand block machines are not substantial. Instead, a "person of ordinary skill in the art" need only understand how the machines are used, and the process used in forming blocks. As discussed above, I have significant experience in this area. For example, I personally designed block molds within one year after starting at Keystone. I was also deeply involved in design and manufacture of the block molds, as well as the blocks themselves.

<u>**C. The Accused Products Manufactured by Concrete Products Do Not Infringe Any Claims of the Patents-in-suit.**</u>

This part of my report is a rebuttal to the opinion offered by Mr. Janopaul, that the Accused Products infringe one or more claims of the three patents-in-suit. The specific claims that Anchor alleges have been infringed are set forth below.

| Patent No. | Londonstone Round | Londonstone Straight Face | Decrowall Round | Rugged Londonstone (all sizes) |
|---|---|---|---|---|
| 6,142,713 | 1-6, 24, 47-54, 61, 64, 67, 69, 70, 72-75 | 61, 62, 69 | 1, 2, 6, 24, 47-50, 61, 64, 70, 74-75 | 1, 2, 6, 24, 47-50, 61, 64, 70, 74-75 |
| 6,183,168 | 1-5, 7, 10-14 | | 1-5, 7, 10-14 | 1-3, 7, 10-14 |
| 6,312,197 | 4-6 | | 4-6 | 4-6 |

It is my understanding that the Minnesota District Court in the <u>Anchor I</u> litigation has previously construed some of the claims at issue. Accordingly, I will use the claim construction adopted by the Court where applicable, without admitting that any construction was correct, and without prejudice to Defendant should Defendant wish to argue different or modified constructions.

It is my opinion that the Accused Products do not infringe the claims at issue for the following reasons: (1) none of the Accused Products contain two-part sidewalls, as claimed in the '713, '168 and '197 patents; (2) each of the Accused Products contains a hole or recess that constitutes a "core;" (3) the Londonstone Round and Decrowall Round products do not have a front surface and a rear surface that are "substantially parallel" to each other, and therefore these surfaces are not "separated by a distance comprising the depth of the block"; and (4) the flange or rear lip on the Accused Products does not extend from the lower surface of the block and is not "adjacent to the back face of the block body," but is instead part of the back face of the block body. Because the Accused Products lack certain limitations of the claims at issue, it is my opinion that the Accused Products do not infringe.

**1. The Accused Products Do Not Contain Two-Part Sidewalls.**

The claims of the patents-in-suit describe the blocks as having sidewall surfaces. This is not unusual, because almost any modular block used in a retaining wall will have a top and bottom, a front surface and a back surface, and two sides. Here, Anchor contends that the Accused Products infringe those claims that describe a two-part sidewall, described in the claims as follows:

> ... said block body comprising ... opposed first and second sidewall surfaces, said sidewall surfaces adjoining said block upper and lower surfaces, each of said first and second sidewall surfaces comprising a first part and a second part, said sidewall surface first parts extending from said block front surface toward said block back surface, and intersecting the front surface at an angle of ninety degrees or less, ....

Similarly, claim 70 of the '713 patent and claim 1 of the '168 patent read as follows:

> . . . said block body comprising . . . first and second sidewall surfaces, each of said sidewall surfaces comprising a first part and a second part, said sidewall surface first parts extending rearwardly from the block front surface at an angle of ninety degrees or less . .

Claim 4 of the '197 patent includes a slightly different phrase, and reads as follows:

> ... and each of said side walls comprising of a first part and a second part, said first parts including portions that diverge as they extend rearwardly ...

I have reviewed and will use the District Court's opinion in the Anchor I litigation, in which the Court construed the relevant language as follows: "Accordingly, 'sidewall comprising a first and second part' is a sidewall with *two distinct* sidewall surfaces." (Anchor I Opinion at 6, emphasis added.)

Mr. Janopaul asserts that all of the Accused Products (the Londonstone Round, Londonstone Straightface, the Decrowall Round, and Rugged Londonstone) have two-part sidewalls. (Janopaul Report at 11.) However, Mr. Janopaul only discusses the round

Londonstone products (the Londonstone Round, and the Decrowall) and the Rugged Londonstone. (Janopaul Report at 10.) Nowhere in his report does he discuss why he believes the Londonstone Straightface product contains a two-part sidewall. Instead, he concludes only that all products have the two-part sidewall. In my opinion, the failure to discuss the Londonstone Straightface demonstrates conclusively that this product does not have two-part sidewalls. As discussed below, the other three products also lack this feature.

a. <u>The Accused Round Products and Decrowall Products Do Not Have Two-Part Sidewalls</u>.

Mr. Janopaul asserts that the accused round products (the Londonstone Round, and the Decrowall Round) have two distinct sidewall surfaces "when viewed from the side." (Janopaul Report at 10.) He bases this opinion on both a visual inspection of the Accused Products "viewed from the side", and a comparison of a hypothetical block made under the patents-in-suit. (Janopaul Report at 9, Figs 1-6.) Based on my personal inspection of the accused round products and my review of Mr. Janopaul's report, I conclude that the accused round products and Decrowall products do not contain two-part sidewalls, and therefore do not infringe the claims at issue.

First, Mr. Janopaul does not properly consider the differences between the three-faceted beveled front of blocks made under the patents-in-suit, and the round front of the Accused Products. For example, in Figure 4 of the claimed block, he describes a three-faceted block with distinct sidewall first parts, identified by reference numbers 34 and 38. (Janopaul Report at 8 and 9, Fig. 4.) The sidewall second parts, reference numbers 32 and 36, extend to the rear of the block. (Id.) The accused round products, in contrast, do not contain a distinct sidewall first part of the type depicted in Figure 4 of Mr. Janopaul's report. This distinction can be seen from the picture of the accused round products provided to me and attached as Exhibit A to this report. In other words, the accused round products have only a rounded front face, and a single sidewall that extends to the rear of the block. This conclusion is borne out by my personal visual inspection of the accused round blocks.

Second, and more importantly, the Court has defined the two-part sidewall language of the patents-in-suit to mean "a sidewall with two distinct sidewall surfaces." None of the Accused Products in my opinion have "two distinct sidewall surfaces." The Court did not define the meaning of the term "distinct." Webster's Dictionary, however, defines "distinct" to mean "separate or individual" and presenting a "clear and unmistakable impression." (Merriam-Webster Dictionary at 152 (1998)). None of the Defendant's blocks, however, have two separate and individual and clear and unmistakable sidewall parts. They do have one, but not two, distinct sidewall parts. That the Accused Products do not have distinct sidewall surfaces is best demonstrated by Janopaul's own opinion, where he states that he sees in some if not all of the Accused Products two distinct sidewall surfaces only "when [the blocks] are viewed from the side." If Janopaul needs to turn the blocks around to a particular angle in order to see what he contends are two distinct sidewalls, then those alleged sidewalls are really not comprised of two distinct (separate and clear and unmistakable) components. As I look at the Defendant's blocks, I see no such distinct two-part sidewall surfaces.

Additionally, all of the Accused Products lack sidewalls with two distinct sidewall surfaces because the front surfaces of all of the Accused Products (excepting the Straight-faced Londonstone) are, essentially, semi-round or curvilinear. The Court has stated that the front surface of the blocks covered by the patents-in-suit may be "smooth, rough, planar or nonplanar, single faceted or multi-faceted." Necessarily, however, the Court did not rule that the front surface of any alleged infringing product may be semi-round or curved. That is to say, I understand that the Court has found or at least implied that a block having a front surface that is semi-round or curved cannot infringe any claim of the patents in suit requiring a two part sidewall surface.

Additionally, any portion of the front face that simultaneously functions as a portion of the front face and sidewall must be "distinct" under the Court's previous claim construction. But Janopaul's report admits clearly that the Accused Products do not contain any "distinct" planar or nonplanar or single or multifaceted sidewall portions. In his report, Janopaul admits that at least some of the Accused Products are produced in such a manner as to create a front face that "approximat[es] . . . a curve." This is a clear admission that the Accused Products (excepting the Straight-faced Londonstone) lack that limitation of the claims within the patents-in-suit asserted by Anchor that require distinct first and second sidewall surfaces. Regarding the Straight-faced Londonstone products, they do not contain two separate and distinct sidewall surfaces because they contain only one sidewall surface on a singular plane interrupted only by a splitter notch.

For these reasons, it is my opinion that the Accused Products do not have two-part sidewalls.

**2. Each of the Accused Products Contains a Hole or Recess that Constitutes a Core.**

Claim 61 of the '713 patent provides as follows:

> ... the block is free from cores *extending through the block*, either from the upper to the lower surface or from one side to the other. (Emphasis added.)

Claim 4, element (a), of the `197 patent reads as follows:

> ... said block body being free of cores *extending through the body from top to bottom*, from front to back, or from side wall to side wall ....
> (Emphasis added.)

The claims and alleged infringing products are listed here:

| Patent No. | Claim Nos. | Alleged Infringing Products |
|---|---|---|
| '713 | 61(e) | Londonstone Multifaceted/Beveled, Londonstone Straightface, Decrowall, Rugged Londonstone (Small Unit, Mid-Size Unit and Large Unit) |
| '197 | 4(a) | Londonstone Multifaceted/Beveled, Londonstone Straightface, Decrowall, Rugged Londonstone (Small Unit, Mid-Size Unit and Large Unit) |

The District Court in Anchor I construed the term "core" to mean "a relatively large void of constituent mass bounded by the body of the block." (Anchor I Opinion at 8.) I will use this definition for my purposes, although it is my understanding that the Court did not define the term "relatively large."

The Accused Products all have cores extending through the block from the top to the bottom surfaces. It is undisputed that all of the products at issue have holes in the center of the block, extending from the top to the bottom thereof, completely through the block. It is also undisputed that these holes are "bounded by the body of the block." (They are in the center thereof). Thus, the only issue in this case is whether those holes are "relatively large," as required by the Court's previous claim construction in Anchor I (assuming that construction is applicable in this case). Although invited to do so, the Court previously declined to further define or clarify what is meant by the term "relatively large." Webster's Dictionary, however, defines "relative" and "relatively" as "a thing having a relation to or a dependence upon another thing." (Merriam-Webster Dictionary at 442 (1998)). Thus, a core is relatively large if it has a relation to or dependence upon the function of what is covered by the term (in this case, "core.")

A core in a retaining wall block serves at least three functions. A core functions to: (1) lighten the weight of the block; (2) assist in the splitting thereof; and (3) accept a pin or fastener in blocks that use pins or fasteners. In all of the Accused Products at issue in this case, the hole in the center of the block is relatively large because, in "relative terms," the hole functions to reduce the weight of the block and to facilitate splitting of the block if, for whatever reason, that is desired. My construction of the term core is fully consistent with the meaning of the term as it appears in at least some of the prior art patents that Anchor disclosed to the patent office in connection with prosecution of the claims at issue, and other patents that I have reviewed. For example, U.S. Patent No. 3,442,991 (the Lanz patent) discloses a device for a mold that contains small "core portions" that are designed to create "cores" at the ends of a finished block. (Lanz patent at Column 4, lines 34-40.) In addition, the so-called "Swiss" patent, Swiss Patent Document No. 663,437 (the Schiffer patent), which Janopaul himself makes reference to, claims a retaining wall block having (in one embodiment) a two-part sidewall with a lower depending flange (covering all of the essential features of the Anchor blocks at issue) with a "core" extending through the block, from one side to the other. That patent, however, describes the "core" as a "cylindrical cavity" extending through the block. (Schiffer Patent at 2.) That is exactly what all of the Accused Products have—a cylindrical cavity extending through the block, although from top to bottom, rather from one side to the other.

These references demonstrate that a "core" can be of varying sizes, and can be located anywhere within the block, depending on the function of the core.

Therefore, even under the Court's broader definition, the holes or recesses in the Accused Products that extend through the body of the Accused Products are properly considered "cores."

3. **The Front and Back Surfaces of the Accused Round Products are Not "Substantially Parallel" to Each Other.**

Claims 1 and 47 of the '713 Patent read as follows:

". . . said front surface and said back surface being *substantially parallel* to each other . . . ." (Emphasis added.)

Mr. Janopaul asserts that the accused round products (the Londonstone Round and the Decrowall) both have front and back surfaces that are "substantially parallel" to each other, because the "middle facet located at the front of the block is parallel to the rear face." (Janopaul Report at 14.) This conclusion is wrong. My examination of the Decrowall and Round Londonstone products at issue in this case leads me to the conclusion that they do not include: (1) front and back surfaces separated by the depth of the block; and (2) front and back surfaces that are substantially parallel to each other.

First, neither of the accused round products has a "middle facet" on the front face. Instead, the front face of these products is rounded or curved, with no flat portion on the front. In other words, there is no flat surface on the front of the accused round products that is parallel – substantially or otherwise – with the flat rear surface. Because there is no middle facet on the round products, and Mr. Janopaul apparently acknowledges that the remainder of the front surface of the accused round products does not infringe, the accused round products cannot infringe as Janopaul contends.

Second, the term "parallel" means "lying or moving in the same direction, *but always the same distance apart*." (Merriam-Webster Dictionary at 378 (1998)). (Emphasis added.) Mr. Janopaul offers his opinion that two surfaces can be "'substantially parallel' even if they are not exactly parallel," but offer no basis for this view. (Janopaul Report at 14.) Based on my inspection of the blocks, it appears that the accused rounded products contain a significant curvature. For this reason, they are neither "parallel" nor "substantially parallel."

Third, Anchor's patent (the '713, at column 5, lines 4-5), which Janopaul cites, states that the front surface of a block is that structure that generally faces outward." That surface of the Decrowall and Round Londonstone products which faces outward is the <u>entire curved front surface</u> of the block, not merely one portion thereof, as Anchor apparently contends. Moreover, the "depth" of the block, as defined by the Anchor patents (see, for example, claim 47 of the'713 patent), is the maximum distance of depth, measured from across the entire front surface of the block, to the entire back surface of the block. Measured in this fashion, only one "depth" measurement is obtained. That is to say, the depth of the block would be the same, across the entire front and back surfaces of the block.

Measuring the "depth" of the Decrowall and Round Londonstone products, however, from across the entire front surfaces of the blocks to the entire back surfaces of the block, does not result in only one depth measurement constituting the depth of the block. Indeed, the distances are separated at many points between the front and back surfaces by something "less than" the depth of the block. Thus, the accused round products do not meet the requirement of Anchor's patents that specify front and back surfaces being "separated by a distance comprising the depth of the block" (See, e.g., Claim 70 of the '713; Claim 1 of the '168 and Claims 1 and 47 of the '713) For this same reason, the two surfaces are not parallel, or even generally or

substantially parallel to each other. Thus, in my opinion, the Decrowall and Round Londonstone products do not have front surfaces that are substantially parallel to the back surface and separated by a distance comprising the depth of the blocks.

### 4. The Rear Lip or Flange Does Not Extend Downwardly from the Lower Surface of the Block Body.

Finally, Mr. Janopaul asserts that each of the Accused Products infringes because they contain "a flange that extends downwardly from the bottom surface" of the block. (Janopaul Report at 15.) This statement is false, because the flange or lip found on each of the Accused Products extends downwardly from the block body itself, and not the lower surface of the block.

Anchor uses several variations and descriptions to describe the flange on its products. For example, Claim 1(b) of the '713 patent describes a "flange extending downwardly from the block lower surface." Claim 8(e) of the '713 patent describes a "flange extending below the lower face of the block," which "intersects the lower face of the block." Claim 23 of the '713 patent describes a flange with a rear face "which is substantially an extension of the rear face of the block." Anchor's own descriptions demonstrate that each description of the flange must have a separate and distinct meaning. Therefore, that portion of Anchor's claim that provides for a "flange extending downwardly from the lower surface of the block body," (Claim 70 of the '713 and Claim 1 of the '168 patent) means exactly what it says.

In my opinion, the flange on the Accused Products does not extend downwardly from the bottom surface, but rather extends from the block body itself. Because the flange on the Accused Products does not "extend downwardly from the lower surface of the block body," the Accused Products do not infringe claims 1 and 70 of the '713 patent, or Claim 1 of the '168 patent.

## CONCLUSION

As discussed above, it is my opinion that the block retaining wall and mold processes claimed within the patents-in-suit were obvious to one skilled in the art as of or before February 1989. It is also my opinion that the Accused Products do not infringe the claims of the patents-in-suit, as alleged by Anchor.

## IV. DATA AND OTHER INFORMATION CONSIDERED

A complete list of all documents, data and sources I relied on in forming my opinions is attached as Appendix One.

## V. PUBLICATIONS WITHIN THE LAST TEN YEARS

A complete list of all publications I have authored or co-authored, including all those within the last ten years, is attached to my resume, which is Appendix Two.

## VI. CASE TESTIMONY WITHIN THE LAST FOUR YEARS

I have not offered expert testimony at trial or by deposition in any case within the preceding four years.

## VII. COMPENSATION

I am being compensated at the rate of $125 per hour for my services to date, which include, for example, preparing and reviewing this report, and preparing for and attending any necessary pre-trial depositions.

## VIII. EXHIBITS TO BE USED TO SUPPORT MY OPINIONS

I anticipate preparing and using various exhibits for use at trial as an aid to the Court in presenting my analysis and opinions. The specific exhibits to be used at trial are being prepared, and will be disclosed in accordance with all applicable trial deadlines. I anticipate that any trial exhibits prepared will be supported by the information contained in this report, or from other sources identified within this report. Information or documents not yet produced by the plaintiffs may also be used as exhibits.

John Potter

1-30-04
Date

John Potter

College: Associate of arts in business from Normandale College, Certificates from Dunwoody Institute

Owned Forklift Sales and Service Inc. from 1981 to 1988

Co-founder and partner of Keystone Retaining wall systems from 1986 to 2001

At Keystone my duties included but were not limited to; research and development of products, Licensing, Licensing support, marketing, sales. Also was President of Petratech which manufactures and sells an erosion control product.

I was involved in trade committees with NCMA, Golf course Superintendents and others

2001 to present President of Deck Technologies. Deck Tech takes natural quarried Stone and is laminated to a high strength laminate to create a structural stone panel used on raised wood framed decks.

## APPENDIX ONE TO EXPERT REPORT OF JOHN POTTER

Documents Reviewed and Relied on Concerning Expert Report of January 30, 2004

1. The Complaint in this matter;
2. Defendant's Answer and Counterclaim in this matter;
3. Expert Reports of Peter Janopaul;
4. Expert Reports of Victor Elias;
5. Deposition transcript of Glenn Bolles dated September 23, 2003;
6. Deposition transcript of Peter Janopaul dated October 29, 2003;
7. Deposition transcript of Douglas Strawbridge dated October 1, 2003;
8. Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment of Infringement, Validity and Enforceability and Declarations;
9. Defendant's Memorandum of Law in Support of Motion for Summary Judgment and Affidavit;
10. Copies of the '015 Patent, the '713 Patent, the '168 Patent, and the '197 Patent.